**No. 11-12537-G**

In the

# United States Court of Appeals
# for the Eleventh Circuit

◆

## JAMON BRIM

*Plaintiff/Appellee,*

**v.**

## MIDLAND CREDIT MANAGEMENT, INC.

*Defendant/Appellant.*

◆

On Appeal from the United States District Court
for the Northern District of Alabama, Northeastern Division
Case No. 5:10-cv-00369-IPJ

◆

### REPLY BRIEF OF APPELLANT

◆

Eric B. Langley
Jason B. Tompkins
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
(205) 251-8100

Kevin C. Newsom
Anna Manasco Dionne
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 521-8803
knewsom@babc.com

Edmund S. Sauer
BRADLEY ARANT BOULT CUMMINGS LLP
Roundabout Plaza
1600 Division Street, Suite 700
Nashville, TN 37203
(615) 244-2582

Attorneys for Appellant

*Brim v. Midland Credit Management, Inc.*
No. 11-12537-G

## CERTIFICATE OF INTERESTED PARTIES AND
## CORPORATE DISCLOSURE STATEMENT

The following is a list of all judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates and parent corporations, any publicly held company that owns 10 percent or more of a party's stock, and other identifiable legal entities related to a party:

Balch & Bingham LLP, attorneys for Defendant-Appellant Midland Credit Management, Inc.;

Bennett, Leonard A., attorney for Plaintiff-Appellee Jamon T. Brim;

Bond Botes Sykstus & Larsen PC, attorneys for Plaintiff-Appellee Jamon T. Brim;

Bradley Arant Boult Cummings LLP, attorneys for Defendant-Appellant Midland Credit Management, Inc.;

Brim, Jamon T., Plaintiff and Appellee;

Cauley, Penny Hays, attorney for Plaintiff-Appellee Jamon T. Brim;

Chatterton, Marcus R., attorney for Defendant-Appellant, Midland Credit Management, Inc.;

Consumer Litigation Associates PC, attorneys for Plaintiff-Appellee Jamon T. Brim;

*Brim v. Midland Credit Management, Inc.*
No. 11-12537-G

Dionne, Anna Manasco, attorney for Defendant-Appellant Midland Credit Management, Inc.;

Encore Capital Group, Inc., parent company of Midland Credit Management (ticker symbol ECPG);

Hays Cauley PC, attorneys for Plaintiff-Appellee Jamon T. Brim;

Johnson, The Honorable Inge P., United States District Judge;

Langley, Eric B., attorney for Defendant-Appellant, Midland Credit Management, Inc.;

Midland Credit Management, Inc., Defendant and Appellant;

Newsom, Kevin C., attorney for Defendant-Appellant Midland Credit Management, Inc.;

Sauer, Edmund S., attorney for Defendant-Appellant Midland Credit Management, Inc.

Sykstus, Ronald C., attorney for Plaintiff-Appellee Jamon T. Brim;

Tompkins, Jason B., attorney for Defendant-Appellant Midland Credit Management, Inc.

This, the 19th day of December, 2011.

s/ Kevin C. Newsom
Kevin C. Newsom

One of the Attorneys for
Midland Credit Management

C-2 of 2

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE
DISCLOSURE STATEMENT ................................................................C-1

TABLE OF AUTHORITIES ................................................................ iii

TABLE OF RECORD REFERENCES IN THE BRIEF........................ vi

INTRODUCTION ...............................................................................1

I.    Midland Is Entitled To Judgment As A Matter Of Law.................................2

    A.    The Evidence Is Insufficient To Establish That Midland
        "Willfully" Violated the FCRA.......................................................... 2

        1.    Midland had no clear notice that its investigation of
                Brim's dispute violated the FCRA.................................................2

        2.    Clear notice aside, Midland's investigation of Brim's
                dispute was not willfully inadequate. .........................................5

    B.    The Evidence Is Insufficient To Establish That Midland's
        Investigation Caused Brim's Alleged Injury..................................... 11

        1.    Brim's suggested steps would not have changed the result
                of Midland's investigation. ........................................................12

        2.    Midland's failure to discover the error in Brim's account
                did not cause any credit injury..................................................16

II.   In The Alternative, Midland Is Entitled To A New Trial..............................18

    A.    The American Express Letter Was Unauthenticated Hearsay. .......... 18

    B.    The Evidence and Commentary Concerning Midland's Parent's
        Financial Condition Was Inadmissible. ............................................ 21

III.  In The Alternative, Midland Is Entitled To A Substantial Reduction (Or
    Elimination) Of The Grossly Excessive $623,180 Punitive Damages
    Award.........................................................................................23

    A.    The District Court Misapplied *BMW*'s "Reprehensibility"
        Guidepost......................................................................... 23

i

1.    The district court impermissibly deferred to what it erroneously called the jury's reprehensibility "finding." .........23

2.    The district court largely ignored and misapplied the prescribed reprehensibility criteria. ..........................................25

B.    The District Court Misapplied *BMW*'s "Ratio" Guidepost................ 28

CONCLUSION ..........................................................................................30

CERTIFICATE OF COMPLIANCE .......................................................31

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Gosdin*
  803 F.2d 1153 (11th Cir. 1986)..........................................................................21

*BMW of North America, Inc. v. Gore*
  517 U.S. 559, 116 S. Ct. 1589 (1996) ......................................................... passim

*Cahlin v. General Motors Acceptance Corp.*
  936 F.2d 1151 (11th Cir. 1991)............................................................ 11, 16, 18

*Chiang v. Verizon New England*
  595 F.3d 26 (1st Cir. 2010) ................................................................. 11, 12, 13

*Cousin v. TransUnion Corp.*
  246 F3d 359 (5th Cir. 2001).................................................................................6

*Dennis v. BEH-1, LLC*
  520 F.3d 1066 (9th Cir. 2008)...................................................................... 14, 15

*Goldsmith v. Bagby Elevator Co.*
  513 F.3d 1261 (11th Cir. 2008)............................................................ 23, 25, 26

*Johansen v. Combustion Eng'g, Inc.*
  No. CV 191-178, 1997 WL 423108 (S.D. Ga. June 9, 1997).............................25

*Johansen v. Combustion Engineering, Inc.*
  170 F.3d 1320 (11th Cir. 1999)........................................................................24

*Johnson v. MBNA America Bank, NA*
  357 F.3d 426 (4th Cir. 2006)................................................................... 5, 8, 13

*Kemp v. AT&T Co.*
  393 F.3d 1354 (11th Cir. 2004)........................................................................26

*King v. Asset Acceptance, LLC*
  452 F. Supp. 2d 1272 (N.D. Ga. 2006) ...............................................................8

*Levine v. World Fin. Network Nat'l Bank*
  554 F.3d 1314 (11th Cir. 2009)........................................................................3, 4

iii

*Motorola Credit Corp. v. Uzan*
  388 F.3d 39 (2d Cir. 2004) ....................................................................29

*Robertson v. J.C. Penny Co.*
  No. 2:06-CV-3KS, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008).......................15

*Safeco Ins. Co. of Am. v. Burr*
  551 U.S. 47, 127 S. Ct. 2201 (2007) ............................................. 2, 3, 5

*Sepulveda v. Burnside*
  432 Fed. Appx. 860 (11th Cir. 2011) ..................................................29

*State Farm Mutual Automobile Insurance Co. v. Campbell*
  538 U.S. 408, 123 S. Ct. 1513 (2003) .................................... 25, 28, 29

*United States v. Arias-Izquierdo*
  449 F.3d 1168 (11th Cir. 2006)..........................................................19

*United States v. Bueno-Sierra*
  99 F.3d 375 (11th Cir. 1996)..............................................................20

*United States v. Glover*
  179 F.3d 1300 (11th Cir.1999)...........................................................15

*United States v. Langford*
  647 F.3d 1309 (11th Cir. 2011)..........................................................20

*United States v. Municipal Authority of Union Township*
  150 F.3d 259 (3d Cir. 1998) ........................................................ 21, 22

*Zhang v. American Gem Seafoods, Inc.*
  339 F.3d 1020 (9th Cir. 2003)...........................................................26

**Statutes**

15 U.S.C. § 1681s-2 ................................................................... 5, 11

15 U.S.C. § 1692c(c)........................................................................12

**Rules**

Fed. R. Evid. 103(a) (2010) ..............................................................22

Fed. R. Evid. 803(6) (2010). ................................................. 18, 19, 20

Fed. R. Evid. 902(11) (2010) ...................................................................20

## TABLE OF RECORD REFERENCES IN THE BRIEF

| **Brief Page #** | | **Docket #** |
|---|---|---|
| 19 | Defendant's Motions in Limine (Exhibit B, referenced in this brief, is attached as Addendum A) | 62 |
| 1 | Judgment | 72 |
| 9, 10 | Unopposed Motion to Supplement Trial Record | 85 |
| 24, 25 | Order (Denying Defendant's Post-Judgment Motions) | 99 |
| 4, 7, 21, 22 | Transcript of Proceedings (Volume 2) | 111 |
| 9, 13, 14, 16, 17, 18 | Transcript of Proceedings (Volume 3) | 112 |
| 11, 21 | Transcript of Proceedings (Volume 4) | 113 |

**INTRODUCTION**

Judgment was entered against Midland on only one count—Brim's "claim for willful non-compliance" with the FCRA.  R72.  Accordingly, this is a straight willfulness case, not a negligence case.  And to his credit, Brim seems to recognize as much.  His brief employs the sort of extraordinary rhetoric that one might expect to see in a *true* willfulness case.  According to Brim, Midland "deliberately devised" (Red Br. 28) and "willfully and knowingly adopted unlawful protocols" (*id.* at 34) "with the goal of violating the FCRA" (*id.* at 14), and then "ignore[d]" his "objectively and irrefutably valid FCRA disputes" (*id.* at 10).  But Brim doesn't stop there.  He goes on to say that Midland's analysis of its FCRA obligations—and the applicable law more generally—is not just wrong, but "disingenuous[]" (*id.* at 27), "baseless" (*id.* at 50), "foolish" (*id.* at 36), "bizarre" (*id.* at 57), "audacious" (*id.* at 45), "myopic" (*id.* at 57), "hyperbolic" (*id.* at 50), "chimerical" (*id.*), "picayune" (*id.*), "formulaic" (*id.* at 62), "sterile" (*id.*), a "sham" (*id.* at 32), and a "canard" (*id.* at 34).

Brim's strategy is clear enough.  He needs to paint as egregious a picture as possible in order to justify a finding that Midland so *willfully* (rather than just negligently) violated the FCRA that it should be hit with a $623,180 punitive-damages award.  But Brim's *ad hominem* broadsides can't stand in for sound analysis.  Is it regrettable that the inaccuracy in Brim's credit report wasn't corrected sooner?

1

Absolutely.  But did Midland willfully violate the FCRA?  Absolutely not.  Under the applicable law, the district court's judgment is due to be reversed.

## ARGUMENT

## I.    Midland Is Entitled To Judgment As A Matter Of Law.

### A.    The Evidence Is Insufficient To Establish That Midland "Willfully" Violated the FCRA.

Brim's willfulness argument fails for two independent reasons.  First, Midland lacked the required clear notice—from the FCRA's text, analogous federal appellate precedent, or FTC guidance—that its investigation of Brim's dispute violated the statute.  Second, clear notice aside, there simply isn't any evidence that Midland engaged in truly willful (as opposed to merely negligent) behavior.

### *1.    Midland had no clear notice that its investigation of Brim's dispute violated the FCRA.*

To prove willfulness—and thus open the door to punitive damages—Brim must demonstrate, at the very least, that Midland's conduct involved "an unjustifiably high risk" of violating the FCRA that was "either known or so obvious that it should [have been] known."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68, 127 S. Ct. 2201, 2215 (2007) (internal quotation marks omitted).  And to prove that Midland either knew or "obvious[ly]" should have known of this "unjustifiably high risk," Brim must demonstrate that Midland's conduct was "'objectively unreasonable' under either [1] the text of the Act or 'guidance from [2] the courts of appeals or [3] the Federal Trade Commission that might have warned [it] away

2

from the view it took.'"  *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009) (quoting *Safeco*, 551 U.S. at 70, 127 S. Ct. at 2215–16).

*Safeco* and *Levine* thus embody a clear-notice prerequisite to willfulness liability.  Brim takes several passes at addressing what he rightly calls "[t]he *Safeco* rule requiring prior guidance."  Red Br. 30.  None works.

*a.*  Brim initially asserts that the clear-notice rule "does not displace liability for a willful violation such as here."  *Id*.  With respect, Brim misunderstands.  The point isn't that the clear-notice rule *displaces* the willfulness requirement, but that it *implements* the willfulness requirement.  Only when a creditor has clear, authoritative notice that its challenged conduct contravenes the FCRA can it fairly be said to have run "an unjustifiably high risk" of violating the statute that was either "known" or "obvious."  *Safeco*, 551 U.S. at 68, 127 S. Ct. at 2215.

*b.*  Brim next attempts to sidestep the clear-notice requirement as "inapposite" on the ground that it applies only "where the defendant's violation of the FCRA results from a misreading" of the statute; "[n]o such misreading," he says, "is alleged to have occurred here."  Red Br. 29.  Brim cites no authority for his view that the clear-notice rule's applicability depends on a defendant's subjective misinterpretation of the FCRA.  Nor could he, as willfulness is an "objective" standard.  *See Safeco*, 551 U.S. at 70–71, 127 S. Ct. at 2215–16; *Levine*, 554 F.3d at 1318–19.

3

And in fact, courts apply the clear-notice requirement even absent any indication that the defendant subjectively misread the FCRA.  *Levine* is illustrative. The evidence there actually indicated that the defendant had subjectively interpreted the statute to *prohibit* its challenged conduct, but adopted a different litigating position to justify its actions.  554 F.3d at 1318–19.  Despite the lack of any alleged subjective misinterpretation, this Court enforced the clear-notice requirement and held that the defendant was entitled to summary judgment.  *Safeco*, the Court observed, "instructs [courts] not to consider the [defendant's] subjective intent." *Id.* at 1319.

In any event, the distinction that Brim seems to envision between pure "interpretation" cases (to which he says the clear-notice rule should apply) and ordinary "conduct" cases (to which it should not) is a false one.  At bottom, *every* FCRA case is *both* an "interpretation" case *and* a "conduct" case.  Lenders like Midland familiarize themselves with the FCRA and the authoritative interpretations of it, and then structure their operations and order their conduct accordingly. *Cf.* R111:106 (Midland).

*c.* On the merits of clear notice, Brim attempts to locate the required warning in what he calls the FCRA's "detailed and specific" text.  Red Br. 17.  The applicable statutory provision is anything but.  As relevant here, the FCRA merely requires furnishers to "conduct an investigation with respect to the disputed infor-

4

mation." 15 U.S.C. § 1681s-2(b)(1)(A). That spare one-liner couldn't possibly have given Midland the required notice that its investigation of Brim's particular dispute was inadequate.

Nor could court decisions generally requiring that FCRA investigations be "reasonable" provide the required warning. Red Br. 19. Brim points, for instance, to the Fourth Circuit's decision in *Johnson v. MBNA America Bank, NA*, 357 F.3d 426 (4th Cir. 2004). The court there rejected a furnisher's assertion that the FCRA requires only "superficial, *un*reasonable inquiries by creditors" and held, instead, that creditors must "conduct a reasonable investigation of their records to determine whether the disputed information can be verified." *Id.* at 431. Without more, though, a requirement that a party act "reasonabl[y]" doesn't provide the sort of particularized guidance necessary to inform him of an "obvious" and "unjustifiably high risk" of violating the law. *Safeco*, 551 U.S. at 68, 127 S. Ct. at 2215.

### 2. *Clear notice aside, Midland's investigation of Brim's dispute was not willfully inadequate.*

Even apart from the clear-notice requirement, *Safeco* and *Levine* make clear that the bar for willfulness liability under the FCRA is high—as it should be, since a willfulness determination takes the case out of the realm of simple liability and exposes the defendant to punitive damages.

Brim's willfulness argument revolves around three key assertions, which he repeats throughout his brief: (1) that Midland conducted absolutely "no investiga-

5

tion" of his dispute; (2) that Midland wrongly engaged in what he calls rote "data-matching" to process his dispute; and (3) that Midland impermissibly refused to treat his bank statement as "irrefutable" proof of payment. None of these contentions supports a willfulness determination.

a. *"No investigation."* Presumably in an effort to overcome the clear-notice problem, Brim *repeatedly* asserts that Midland conducted "no investigation" of Brim's dispute. *See* Red Br. 9, 10, 19, 23, 29, 31, 44, 46. That is incorrect. Midland conducted an investigation, and indeed did so (as Brim acknowledges) "in complete conformity with established protocols." Red Br. 27. What Brim means when he says that Midland conducted "no investigation" is that Midland conducted an investigation *that Brim thinks was deficient.* So to be clear, the question here is *not* whether Midland conducted an investigation of Brim's dispute—it did—but, rather, whether the investigation it conducted willfully violated the FCRA.

b. *"Data-matching."* Brim also contends that Midland willfully violated the FCRA by using a "batch-interface" system to process his disputes. At trial, Brim emphasized the batch-interface system's automated nature as the key indicator of Midland's willfulness. In response to Midland's showing that the use of an automated debt-tracking system is *not* inherently unreasonable, let alone willful (Blue Br. 27–28 (citing *Cousin v. TransUnion Corp.*, 246 F.3d 359, 375 (5th Cir. 2001))), Brim has shifted gears. He now attempts to ground his willfulness claim

6

in what he calls the "data-matching" aspect of Midland's system—"irrespective of whether its implementation is automated or manual."  Red Br. 34.

"Data-matching" is a core theme in Brim's argument.  The sinister-sounding term appears in his brief at least a dozen different times.  *See, e.g.*, Red Br. 21, 22, 24, 26, 31, 56, 58, 59.  But the label doesn't fairly characterize Midland's investigation.  To read Brim's brief, one would assume that Midland did nothing more than digitally verify account information that it had received (digitally) from Dell—namely, Brim's biographical information and the fact that Brim had an outstanding balance.  But that's just not true.  As already explained (Blue Br. 6–7), when Brim initially submitted his dispute to Midland, a consumer-relations employee "opened and read" his correspondence and reviewed the enclosed bank statement to determine whether it constituted valid proof of prior payment.  R111:97 (Midland).  Having determined pursuant to Midland policy (a policy Dell shared) that Brim's bank statement was *not* sufficient proof of payment, Midland's employees did not code Brim's account as previously paid or refer it for follow-up.  *Id.* at 99–103.

When Midland subsequently received Brim's ACDVs from the CRAs, the batch-interface system processed them and compared them to the "information on the actual Midland account"—*i.e.*, the product of Midland's earlier human analysis.  *Id.* at 141.  No further manual review of the ACDVs was triggered (or neces-

7

sary) because a Midland employee had already determined that Brim's bank statement was insufficient evidence of payment. *Id.* at 119, 121–22, 141.

Brim's reliance on the Fourth Circuit's *Johnson* decision to impugn Midland's investigation is misplaced for three reasons. First, as we have already explained—but as Brim conspicuously never acknowledges—*Johnson* was a negligence case, not a willfulness case. Blue Br. 23, 27. Second, the fundamental premise of Brim's "data-matching" argument is that Midland had to go beyond its own files and "consult primary or outside sources as necessary to reach a substantive determination." Red Br. 32. *Johnson*, though, expressly limits creditors' obligation "to conduct a reasonable investigation ***of their records*** to determine whether the disputed information can be verified." 357 F.3d at 431 (emphasis added).

Third, Midland's investigation here was not the "superficial" review undertaken in *Johnson*. *Id*. The furnisher there did "not look beyond the information contained in" its computer system and, notably, "never consult[ed] underlying documents" implicated by the consumer's dispute. *Id*. By contrast, a Midland employee personally reviewed Brim's bank statement and determined, in accordance with company policy, that it was insufficient proof of payment.

Midland's investigation did not willfully violate the FCRA. *See, e.g.*, *King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272, 1279–80 (N.D. Ga. 2006) (holding as a matter of law that furnisher's response to ACDV was not willfully inade-

quate where furnisher "compare[ed] the information provided [in an ACDV] with its internal records" and reported the account as "disputed").

   *c.* ***"Irrefutable proof."***    Brim finally contends that Midland willfully violated the FCRA by "[i]gnoring" his bank statement, which he says was "documented and irrefutable proof" of his payment to Dell.  Red Br. 1; *accord, e.g.*, Red Br. 1, 20, 22, 29, 30, 44, 46.  According to Brim, the bank statement "provided all of the information that any reasonable person or system needed to verify Mr. Brim's disputes."  *Id.* at 44.

   With respect, Brim is wrong about bank statements.  As explained at trial, both Dell and Midland *independently* reached the conclusion that Brim's bank statement, standing alone, was not sufficient "proof" of payment.  Blue Br. 7.  That may initially strike the uninitiated as somewhat strange.  Each of us is accustomed to thinking of our own bank statements as "official records," so to speak.  And from the perspective of the consumer—whose only interest is in tracking money into and out of his account—that makes sense.  But as relevant to the issues here, the Dell/Midland policy of requiring more is understandable.  Most significantly, bank statements typically lack the "tracing" information that is contained in transaction detail reports ("TDRs").  R85:Ex.A: 10–11, 29, 34–35 (Dell); R112:217–19 (Redstone).  Without that essential tracing information, bank statements can't prove that a payment was *actually received* by the creditor:  Although a bank

9

statement might indicate "that a payment is showing to be *sent*" to a creditor, "it still doesn't show proof that [the creditor] actually *got* the payment."  R85:Ex.A: 61 (emphasis added).  Because unlike consumers, creditors have to pay attention to both the "sent" and the "received" ends of the transaction, reliable tracing information is critical.  TDRs provide that information; bank statements don't.

Even if one could debate the wisdom of Midland's refusal to treat Brim's bank statement standing alone, as conclusive "proof" of payment, its position was hardly irrational, nor was it *willfully* violative of the FCRA.  Brim offered no evidence at trial that his bank statement actually "confirm[ed] the payment" to Dell in any way.  Red Br. 2.  Particularly given the mismatch between (1) the $954.12 debit on Brim's bank statement, (2) the $934.78 balance shown on Dell's original invoices, and (3) the $1381.01 purchase balance reflected in Midland's records, it was at the very least reasonable for Midland to require additional evidence of payment.  *Compare* DX1–2 *with* DX7 *and* PX15.

There is one final point about Brim's emphasis on the adequacy of his bank statement.  Brim repeatedly suggests in his brief that he never had any idea that his statement was insufficient proof of payment or that he needed to provide a TDR.  That is not true.  It is undisputed that Brim was told as early as 2005—and on more than one occasion— that his bank statement would *not* suffice as proof of payment, and that he needed to provide a TDR instead.  Blue Br. 4–5 (citing R85:Ex.A:12–

10

14, 30–33, 35 (Dell) and DX8 (BBB activity report)).  Had Brim provided the re-
quested TDR, Dell could have traced his payment and credited his account.  And
as even Brim now admits, it was his eventual production of the TDR—nearly five
years after it was initially requested—that "helped solve the mystery" in this case.
Red Br. 37.[1]

### B.    The Evidence Is Insufficient To Establish That Midland's Investigation Caused Brim's Alleged Injury.

Brim does not dispute that, to establish causation under the FCRA, he is re-
quired to make two showings—first, that Midland's allegedly faulty investigation
caused it to miss the reporting error regarding his payment to Dell, *see, e.g.*,
*Chiang v. Verizon New England*, 595 F.3d 26, 37 (1st Cir. 2010); and second, that
the reporting error caused him to suffer an injury, *see, e.g.*, *Cahlin v. Gen. Motors
Acceptance Corp.*, 936 F.2d 1151, 1161 (11th Cir. 1991).  He fails to satisfy both
requirements.  Blue Br. 32–40.

---

[1]  Throughout his brief, Brim erroneously suggests that this case involves not only
the adequacy of Midland's investigation but also the accuracy of information that
Midland reported to the CRAs.  Red Br. 1, 10, 19.  As Brim's counsel acknowl-
edged at trial, "the question in this case is simply" the reasonableness of the
"search and inquiry" conducted by Midland:  "That's it.  That's all."  R113:37.
And indeed, 15 U.S.C. § 1681s-2(a), which addresses the "[d]uty of furnishers of
information to provide accurate information" to CRAs, provides for no private
right of action.  *Id.* § 1681s-2(c)(1).  Rather, a furnisher's subsection (a) obliga-
tions are "enforced exclusively" by federal and state regulatory officials.  *Id.*
§ 1681s-2(d).

11

### 1. *Brim's suggested steps would not have changed the result of Midland's investigation.*

As Brim seems to acknowledge, at step one of the causation analysis, he must show what additional investigatory steps Midland should have taken and how they would have produced a different result. At trial, Brim contended that Midland should have contacted (1) him directly, (2) his bank, Redstone, and (3) Dell. Blue Br. 33–34.

Brim's argument on appeal has shifted somewhat. Brim no longer contends that Midland should have contacted him directly. And with good reason. As already explained (Blue Br. 35–36), Midland was under no legal obligation to contact Brim as part of its investigation, *Chiang*, 595 F.3d at 36, and, in fact, was statutorily *prohibited* from contacting him given the two separate cease-and-desist letters that Brim sent to Midland (PX11, 12) simultaneously with the filing of his CRA disputes. 15 U.S.C. § 1692c(c). Brim also seems to have abandoned his earlier contention that Midland should have contacted Dell as part of its investigation. Again, with good reason, as contacting Dell—whose records showed an outstanding balance—would only have reinforced Midland's understanding that Brim's debt remained unpaid. Blue Br. 34.

Brim persists in his view that Midland should have contacted Redstone, and he now argues, as well, that merely reexamining the bank statement would have conclusively proved his payment. He is wrong on both counts.

12

*a. **Contacting Redstone.*** Brim continues to insist that Midland should have "contacted [his] credit union, Redstone." Red Br. 46. Doing so, he says, "would have led Midland to the very information that would have allowed it to trace Mr. Brim's payment to the Dell account where it was misapplied." *Id.* That is incorrect.

First, if creditors have no legal duty to contact customers as part of an investigation, *see Chiang*, 595 F.3d at 36, it is hard to imagine that they nonetheless have a duty to contact those same customers' banks. In fact, as already explained (*see supra* at 8), the Fourth Circuit's decision in *Johnson*—Brim's willfulness lodestar—specifically limits furnishers' obligation "to conduct a reasonable investigation *of their records* to determine whether the disputed information can be verified." 357 F.3d at 431 (emphasis added).

Even assuming that Midland had a duty to contact Redstone, doing so would not have changed the result of its investigation. As Redstone's witness testified without contradiction at trial, Redstone would "not give out any information" about a client's finances to a third party like Midland. R112:219. Because Brim has not shown that the outcome of Midland's investigation would have been any different if Midland had contacted Redstone, his causation argument fails.[2]

---

[2] In an effort to salvage his causation argument, Brim now asserts that Redstone's witness, while "confirm[ing] that Redstone would not provide a TDR to a third party" like Midland, testified that "had a third party such as Dell, Midland, or any-

13

***b. Reexamining the bank statement.*** As already noted, Brim repeatedly asserts that his bank statement "was itself proof of payment." Red Br. 44. Accordingly, with respect to causation, Brim now says that Midland "needed only to consider the Redstone bank statement and act in accordance therewith to have met its FCRA duties." *Id*. at 46. But Midland didn't willfully violate the FCRA merely because it declined to treat Brim's bank statement as conclusive. For reasons already explained, a bank statement is not "irrefutable" proof of payment. Red Br. 1. Accordingly, merely consulting the bank statement—yet again—would not have confirmed that Brim had in fact paid his debt to Dell.

Brim cites only two cases in support of his assertion that, "as a matter of law," a bank statement constitutes "documented proof sustaining [a] consumer's dispute." Red Br. 44. The first, *Dennis v. BEH-1, LLC*, 520 F.3d 1066 (9th Cir. 2008), involved a CRA's failure to reasonably re-investigate its reporting of an adverse civil judgment on a consumer's credit report. The Ninth Circuit held that the

one else asked for the TDR here, 'we would tell them to go to their financial institution, the one that generated the transaction,' where 'they could have gotten the same information,' including 'what account [the payment] was deposited to' '[a]nd the trace number and the amount.'" Red Br. 39 (quoting R112:220–21). Brim's argument misfires in multiple respects. First, it depends on an initial obligation to contact Redstone—which, as just explained, did not exist. Second, in the testimony that Brim cites, the witness discussed only what could have happened "if Dell had called" him. R112:220. He did *not*, as Brim now states, suggest that Dell's bank would have given just any old "third party," including "Midland or anyone else," a TDR to trace Brim's payment. Dell's failure to request a TDR from its own bank cannot now be hung around Midland's neck.

14

agency was negligent—not *willful*, but negligent—in "overlook[ing]" "unambiguous" documents in a public court file that "expressly stat[ed] that *no* adverse judgment [had been] entered" against the customer. *Id.* at 1070–71. In the second case, *Robertson v. J.C. Penny Co.*, No. 2:06-CV-3KS, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008), the court held that a creditor's investigation was negligent—again, not *willful*, but negligent—where its "own computer records, which were accessible to any [of its] employee[s], show[ed] that the [customer had] paid the account in full" and the customer had been given a confirmation number "to confirm receipt of their payment." *Id.* at *8.

Far from supporting Brim's assertion that his bank statement's mere existence established Midland's willful violation, *Dennis* and *Robertson* exemplify the type of "unambiguous," *Dennis*, 520 F.3d at 1070, documentary evidence sufficient to "clearly verify," *Robertson*, 2008 WL 623397, at *8, that a dispute has merit. The missed information in *Dennis* was in an official court file, and was thus by definition reliable. *Cf. United States v. Glover*, 179 F.3d 1300, 1302 n.5 (11th Cir. 1999) ("A court may take judicial notice of its own records and the records of inferior courts." (internal quotation marks omitted)). And in *Robertson*, the creditor actually "concede[d]" that "proof of the [debtor's] payment was contained in [its] contemporaneous account records" and that those records "gave notice of the payment to every [creditor] employee who accessed the records." 2008 WL 623397,

15

at *1.  For reasons already explained, Brim's bank statement stands on a different footing.

### 2.    *Midland's failure to discover the error in Brim's account did not cause any credit injury.*

This Court has "stress[ed]" that, at step two of the causation test, an FCRA plaintiff has an "affirmative duty of coming forward with evidence supporting his claim that [the] alleged inaccurate [credit] report caused him harm."  *Cahlin*, 936 F.2d at 1161.  Brim hasn't met this burden.

Brim doesn't dispute that a credit denial letter purportedly sent by American Express is the only documentary evidence of credit injury in this case.  But as already explained (Blue Br. 36–39), that letter fails to establish credit injury because (1) it shows that the *sole stated basis* for American Express's denial was its determination that Brim's "consumer credit bureau score from TransUnion [was] too low" (PX7) and (2) TransUnion's own witness explained at trial that the Midland account—because it was properly reported as "disputed"—"wouldn't have been factored into [Brim's] credit score" (R112:50).  Just as in this Court's analogous decision in *Cahlin*, that clear, direct evidence "completely overwhelm[s]" any possible inference that the Midland account might have caused American Express's denial.  936 F.2d at 1161.

Brim's only response is to accuse Midland of "carefully select[ing]" the language from the TransUnion witness's testimony.  Red Br. 48.  In particular, Brim

16

asserts that Midland's "quotation of his testimony is incomplete and its characterization of that evidence" "transparently incorrect." *Id*. at 47. The reason, Brim says, is that TransUnion's representative "qualified his opinion" when he testified that he couldn't "'say with any degree of certainty whether [the Midland account] mattered'" to creditors generally. *Id*. at 48 (quoting R112:62). With respect, Brim misunderstands. Midland isn't cherry-picking. The generalized testimony that Brim highlights—about whether the Midland dispute might have "mattered" to creditors in the abstract—doesn't change the undisputed facts that (1) American Express stated in its letter that it relied exclusively Brim's credit "***score***" in denying his application (PX7); and (2) TransUnion's witness clearly explained that the Midland dispute wouldn't have affected that "***score***" (R112:50). The subsequent testimony that Brim cites is irrelevant to American Express's own *sole stated reason* for denying his application.

For reasons already explained, the other alleged—but undocumented—credit denials by Capital One and various mortgage companies do not establish causation. Blue Br. 39–40. Brim admitted at trial that he was never told that any of these alleged denials was caused by the Midland dispute. R112:127–31, 137, 171. He now asks this Court to infer causation based on his bare assertion that "there was no reason other than the Midland 'debt' for the denials." Red Br. 6. But the only evidentiary basis for that inference is his own testimony that, "[a]t the time" of the

alleged denials, he was not "aware of any other reason" for them.  R112:95–96.

What matters, though, is the actual content of the credit reports purportedly consi-

dered by the creditors, and as Brim acknowledged at trial, there *were* other adverse

items on his report at the relevant time.  R112:138–42.

Under *Cahlin*, there simply is no basis here for the "inference that allegedly

inaccurate information on [Brim's credit] report was the cause of [his] denial of

credit."  936 F.2d at 1161.[3]

## II.    In The Alternative, Midland Is Entitled To A New Trial.

### A.    The American Express Letter Was Unauthenticated Hearsay.

There seems to be no dispute that the district court admitted as a "business

record" *Brim's own copy* of the American Express letter (PX7).  As explained in

Midland's opening brief, the letter isn't admissible under Rule 803(6)'s business-

records exception because it wasn't "kept" by American Express in the regular

course of business.  Blue Br. 41–42.

Notably, Brim says nothing in response to Midland's demonstration that, in

fact, the letter couldn't have been "kept" as required by Rule 803(6).  Nor could

he.  It is undisputed that, in response to Midland's subpoena, American Express

---

[3]  Concerning Brim's evidence of emotional distress, we will say only this:  The
parties apparently agree (Blue Br. 13–14, Red Br. 8–9) that the *entirety* of Brim's
testimony on the subject is contained at R112:108–09, 121–23.  A fair reading of
that testimony shows it to be impermissibly conclusory.

confirmed that it had no record of Brim's *existence*, let alone his credit application or denial.  R62:Ex.B (attached as Addendum A).

Instead, Brim wagers the letter's admissibility entirely on a so-called "affidavit of records," which he seems to admit he produced to Midland only on Saturday afternoon before trial commenced on Tuesday morning (following a Monday holiday).  Unable to refute Midland's demonstration that not even the affidavit states that the letter was "kept" by American Express, Brim lashes out, accusing Midland of "picayune wordplay."  Red Br. 50.  Far from it.  Grammatically, the affidavit is a garbled mess; it is almost impossible to decipher.  Read charitably, it seems to be saying something like, "Looks like something that might have come from us."  PX7, at 1.  What it does *not* say (as it must) is that the letter was *itself* "kept in the course of a regularly conducted business activity."  Fed. R. Evid. 803(6) (2010).

To be clear, Rule 803(6)'s requirement that a record not only be "made . . . by . . . a person with knowledge" but also "kept in the course of a regularly conducted business activity" is no "picayune" technicality.  *See, e.g.*, *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1183–84 (11th Cir. 2006) (recognizing that Rule 803(6) requires that "records be *prepared and maintained* for business purposes in the ordinary course of business") (emphasis added).  The entire justification for the business-records exception is the inherent "reliability" of records actually "made"

19

*and* "kept" by businesses in the ordinary course. *See, e.g.*, *United States v. Bueno-Sierra*, 99 F.3d 375, 378 (11th Cir. 1996). A record that was not *actually* kept—but that merely looks like something that might have been kept—lacks the hallmarks of reliability that justify its admission over a hearsay objection. Because the letter here was indisputably "kept" *only by Brim*, it does not qualify for Rule 803(6)'s protection.

Hearsay objections aside, Brim's eleventh-hour affidavit separately fails to meet Rule 902(11)'s authentication requirements. Blue Br. 42–43. The most glaring problem is that while the affidavit states that its signer is a "custodian of records" generally, it never states that he was the custodian—as in the *keeper*—of PX7 itself. A Rule 902(11) affiant must "be able to identify the record as authentic and specify that it was made *and preserved* in the regular course of business." *United States v. Langford*, 647 F.3d 1309, 1327 (11th Cir. 2011) (internal quotation marks omitted and emphasis added). Without any certification as to preservation, PX7 was not sufficiently authenticated and was thus inadmissible.

Midland has explained in detail the prejudicial effect of the district court's erroneous admission of the American Express letter. Blue Br. 43–45. There is no point in rehashing that argument here, because Brim hasn't responded to it. Because it cannot be said "with fair assurance that the judgment was not substantially

20

swayed by the impermissible evidence," *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir. 1986), Midland is entitled to a new trial.

### B. The Evidence and Commentary Concerning Midland's Parent's Financial Condition Was Inadmissible.

The district court also erroneously admitted evidence concerning the financial condition of Midland's parent corporation, Encore Capital, as a basis for imposing a substantial punitive-damages award against Midland. The court allowed Brim's counsel to invoke Encore's "net worth" in urging the jury that it couldn't "move a giant" with "[s]mall pushes." R111:63. As Brim's counsel rhetorically asked the jury in his closing argument: "How do you make a 300-million-dollar company change its procedures? . . . [T]hat's where you come in." R113:98. The prejudicial admission of this evidence requires a new trial.

In its opening brief, Midland demonstrated, by reference to a number of on-point cases, that a parent corporation's wealth is inadmissible as a basis for imposing a punitive-damages award against a subsidiary except in those rare instances where the corporate veil is pierced. Blue Br. 45–46. Conspicuously, Brim never engages those cases. Instead, he asserts that "[t]his case is subject to the rule established in" *United States v. Municipal Authority of Union Township*, 150 F.3d 259 (3d Cir. 1998)—which he apparently interprets as holding that a parent company's finances become relevant, seemingly for any purpose, "[i]f the subsidiary does not retain its revenues." Red Br. 13, 52. Particularly as compared to the decisions

21

cited by Midland, which specifically address the relevance of a parent's net worth to a claim against its subsidiary *for punitive damages*, the *Union Township* case is way off point. It had nothing to do with punitive damages; it involved a different issue—namely, whether a court could consider a parent corporation's finances in evaluating one of six statutory factors relevant in assessing a Clean Water Act penalty. 150 F.3d at 268. In any event, Brim's current argument—about a subsidiary purportedly "not retain[ing] its revenues"—amounts to little more than a belated claim that corporate formalities should be disregarded in this case. Brim never attempted to pierce Midland's corporate veil here, and he cannot now seek to do so retroactively.

Brim conclusorily asserts that Midland suffered no prejudice from the admission of the Encore evidence because, he says, "the jury set punitive damages at ten percent of Midland's payment for the Dell portfolio and not as a function of the 10-K financials." Red Br. 53. But even if that were true, Brim can't show the jury was not influenced by the inadmissible financial information in other ways, such as in determining the method of calculation (including any use of a 10% baseline).[4]

---

[4] Brim erroneously asserts that Midland waived its challenge to the admission of the Encore evidence by failing to seek a limiting instruction. At the outset of trial, Midland objected to admission of Encore's 10-K in its entirety because it was irrelevant and because there were no grounds to pierce the corporate veil. R111:11–13. The district court overruled Midland's objection, unequivocally holding that the 10-K was a "public document" and "would certainly be relevant to" Brim's "claim for punitive damages." *Id.* at 13, 15. Because the district court "ma[de] a

**III.    In The Alternative, Midland Is Entitled To A Substantial Reduction (Or Elimination) Of The Grossly Excessive $623,180 Punitive Damages Award.**

The Supreme Court requires "exacting appellate review" of the constitutional punitive-damages guideposts. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1283 (11th Cir. 2008). The excessive punitive damages award in this case fails to survive such scrutiny, given the district court's clear misapplication of the "reprehensibility" and "ratio" guideposts.

### A.    The District Court Misapplied *BMW*'s "Reprehensibility" Guidepost.

The district court's treatment of the reprehensibility guidepost was doubly flawed. First, the court failed to independently assess the reprehensibility of Midland's alleged conduct, opting instead to defer to what it erroneously called the jury's "finding" of reprehensibility. Blue Br. 49–51. Second, it largely ignored and badly misapplied the prescribed reprehensibility criteria. *Id.* at 51–58.

#### 1.    The district court impermissibly deferred to what it erroneously called the jury's reprehensibility "finding."

The district court impermissibly failed to undertake an independent examination of reprehensibility. Instead of engaging in a searching analysis of "the aggravating factors associated with particularly reprehensible conduct," *BMW of*

---

definitive ruling on the record admitting [the] evidence," Midland was not required to "renew [its] objection . . . to preserve a claim of error for appeal." Fed. R. Evid. 103(a) (2010) (now Fed. R. Evid. 103(b)).

*North America, Inc. v. Gore,* 517 U.S. 559, 576, 116 S. Ct. 1589, 1599 (1996), the court simply (1) inferred from the large award that the jury *must* have found Midland's conduct reprehensible, and then (2) deferred to that implicit, unarticulated determination:  "The jury determined defendant's conduct to be reprehensible. This court will not set that finding aside, as there is more than sufficient evidence to support such a finding."  R99:14.

Presumably recognizing that the jury never made any such "finding," Brim asserts that the district court in fact made "its own determination[] of reprehensibility."  Red Br. 56.  Tellingly, however, he never addresses the above-quoted language, which clearly shows that the district court simply acquiesced in the jury's verdict.  Instead, Brim points to a single statement in which the court remarked that "the degree of reprehensibility is great" (R99:13) and asserts that this Court's decision in *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11th Cir. 1999), "foreclose[s]" any argument that any "greater elaboration" was required.  Red Br. 56–57.  That is incorrect.

As this Court recognized in *Johansen*, 170 F.3d at 1336, the district court there extensively—and independently—analyzed the reprehensibility of the defendant's conduct and reduced the jury's punitive-damage award because the award was "simply not commensurate with the degree of [the defendant's] reprehensibility."  *Johansen v. Combustion Eng'g, Inc.*, No. CV 191-178, 1997 WL 423108, at

*3 (S.D. Ga. June 9, 1997).  In doing so, the lower court specifically emphasized that the defendant "did not act with intentional malice or cause physical injury," "did not commit illegal acts, knowing or suspecting that the acts were illegal," and was not "a recidivist that continually repeats certain misconduct."  *Id.*

The district court in this case engaged in no comparable analysis.  Instead, as noted above, it unmistakably—and very candidly—deferred to what it wrongly took to be an implicit jury determination.  In so doing, the district court clearly erred.

### 2. *The district court largely ignored and misapplied the pre-scribed reprehensibility criteria.*

Brim further asserts that the district court "identified and applied the five [reprehensibility] factors that a court must consider" under *BMW* and *State Farm*.  Red Br. 55.  To be sure, the lower court *listed* the relevant criteria.  But having done so, it then largely failed to discuss or apply them.  R99:12–14.  That too was error, because district courts "must consider" the reprehensibility factors in review-ing punitive-damages awards.  *Goldsmith*, 513 F.3d at 1283.

*a. Physical harm; health and safety*:  Brim doubles down on the district court's conclusion that the physical-injury and health-and-safety criteria are some-how irrelevant in FCRA cases.  Red Br. 57.  Indeed, he calls the district court's non-treatment of the first two reprehensibility factors "unassailable." *Id*. Curious-ly, though, Brim never engages Midland's extended argument to the contrary—

25

including Midland's demonstration that the district court's refusal to consider the factors flatly contravenes *BMW* itself.   Blue Br. 51–55.

Brim avoids a merits discussion for good reason.   The contention that the physical-injury and health-and-safety criteria just evaporate in FCRA cases doesn't withstand scrutiny.   That this case (like *BMW* before it) involves only economic injury does not mean that the first two reprehensibility factors are irrelevant; it means that they weigh against substantial punitive liability.[5]

***b. Financial vulnerability*:**   While Brim mocks Midland's discussion of financial vulnerability as "myopic," he tellingly never disputes that "the district court *never even mentioned* the financial-vulnerability factor."  Blue Br. 56.

The financial-vulnerability criterion cuts against punitive liability here because there is no evidence that Midland targeted Brim because of his vulnerability. Brim summarily asserts that this Court's decision in *Goldsmith* "belie[s]" Midland's argument that intentional targeting of a financially vulnerable plaintiff is required (Red Br. 58), but *Goldsmith* doesn't squarely address the question, 513 F.3d at 1283, and at least one other decision of this Court suggests that intentional targeting is necessary.  *See Kemp v. AT&T Co.*, 393 F.3d 1354, 1363 (11th Cir. 2004).

---

[5] There is no suggestion in this Court's *Goldsmith* decision that these factors are inapplicable in FCRA cases.  Red Br. 57.  *Goldsmith* was not an FCRA case.  It was a civil-rights case, and civil-rights cases are *sui generis* in terms of the sort of harm that they involve.  *See, e.g.*, *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003) ("[I]ntentional discrimination is a different kind of harm, a serious affront to personal liberty.").

Because there is nothing particularly "reprehensible" about injuring a plaintiff who *just so happens* to be vulnerable, this Court should require some evidence of targeting, and its absence here counsels against punitive liability. Blue Br. 55–56.

Even if the financial-vulnerability criterion did not require targeting, the factor nevertheless weighs against a substantial punitive award here. There has been no finding—by anyone, jury or judge—that Brim was in fact financially vulnerable.

*c. Repeated actions*: Brim asserts that the district court "emphasi[zed] in its post-trial opinion that Midland indiscriminately and systematically victimized literally hundreds of thousands of customers." Red Br. 58. The district court's order, however, contains no such analysis. Nor is there any evidence in the record concerning disputes similar to Brim's. Blue Br. 56.

*d. Intentional malice, trickery, or deceit*: Again, Brim does not dispute that "the district court *never even mentioned* the intentional-malice criterion." Blue Br. 57. Brim repeatedly asserts that Midland "lied" about this and that (Red Br. 59), but he cites no record evidence to support those assertions. Whatever fault Midland may bear for the failure to discover Brim's payment to Dell earlier, its conduct was not intentionally malicious or deceitful.

27

**B.    The District Court Misapplied *BMW*'s "Ratio" Guidepost.**

As explained in Midland's opening brief, the district court committed two very basic errors in its application of *BMW*'s ratio guidepost.  First, the court failed to heed the Supreme Court's directive that, although a single-digit multiplier may be constitutionally permissible in the ordinary case, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee" where, as here, "compensatory damages are substantial."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123 S. Ct. 1513, 1524 (2003).  Second, the district court completely ignored the Supreme Court's caution against punitive liability where, as here, the punitive-damages award likely duplicates emotional damages already contained in a substantial compensatory award.  *Id.* at 426, 123 S. Ct. at 1525.

Brim never even mentions the first problem, and labels Midland's argument as to the second "rank speculation"—because, he says, there is "[n]othing in th[e] record suggest[ing] that the jury disobeyed [the district court's] instructions and combined punitives in the compensatory award."  Red Br. 60–61.  It is unclear exactly what kind of "reliable indicia of duplication" Brim finds lacking.  *Id.* at 60.  As the Supreme Court explained in *State Farm*, what matters is the *nature* of the compensatory award and whether that nature makes it "likely" that the award was

28

"based on a component which was duplicated in the punitive award." *State Farm*, 538 U.S. at 426, 123 S. Ct. at 1525.

Here, as in *State Farm*, the jury's substantial compensatory award was based at least in part—if not entirely—on emotional distress. Because such awards for emotional distress "already contain" a "punitive element" for "outrage and humiliation," it is indeed "likely" that the jury's substantial punitive damages award was duplicative. *Id.*

\* \* \*

For all of these reasons, the jury's grossly excessive $623,180 punitive award should be either eliminated or substantially reduced. At the very least, the Court should remand the case with instructions to consider the excessiveness of the verdict anew in light of the *BMW*/*State Farm* factors that the district court erroneously ignored. *Cf., e.g.*, *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 63–64 (2d Cir. 2004) (remanding because district court's cursory reprehensibility analysis was "insufficient to support such a substantial punitive damages award"); *Sepulveda v. Burnside*, 432 F. App'x 860, 862 (11th Cir. 2011) (remanding because "district court did not sufficiently explain its reasoning under" *State Farm*).

29

## CONCLUSION

This Court should vacate the judgment and enter judgment in Midland's favor.  In the alternative, this Court should reverse the judgment and remand for a new trial or eliminate or substantially reduce the punitive-damages award.

Respectfully submitted,

s/ Kevin C. Newsom

| | |
|---|---|
| Eric B. Langley | Kevin C. Newsom |
| Jason B. Tompkins | Anna Manasco Dionne |
| BALCH & BINGHAM LLP | BRADLEY ARANT BOULT CUMMINGS LLP |
| Post Office Box 306 | One Federal Place |
| Birmingham, AL 35201-0306 | 1819 Fifth Avenue North |
| (205) 251-8100 | Birmingham, AL 35203 |
| | (205) 521-8803 |
| | knewsom@babc.com |

Edmund S. Sauer
BRADLEY ARANT BOULT CUMMINGS LLP
Roundabout Plaza
1600 Division Street, Suite 700
Nashville, TN 37203
(615) 244-2582

Attorneys for Appellant

30

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,999  words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman font size 14.


THIS the 19th day of December, 2011.


_s/ Kevin C. Newsom_____
Kevin C. Newsom

31

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2011, I filed the foregoing with the Clerk of the Court via FedEx and have sent the same to the following individuals via FedEx:

Leonard A. Bennett
Consumer Litigation Associates, PC
12515 Warwick Blvd Ste 100
Newport News, VA 23606

Penny Hays Cauley
Hays Cauley, PC
549 W. Evans St Ste 3
Florence, SC 29501

Ronald C. Sykstus
Bond Botes Sykstus Tanner & Ezzell, PC
225 Pratt Ave NE
Huntsville, AL 35801-4008

Respectfully submitted,

s/ Kevin C. Newsom
Kevin C. Newsom

ADDENDUM A

FILED
2011 Feb-18  AM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

*Brim v. Midland, et al.*
**Case No. 5:10-cv-0369-IPJ**

# Exhibit B
# Letter from American Express
# in Response to Subpoena



American Express / DATAMARK
Attention: Subpoena Compliance
43 Butterfield Circle
El Paso, TX 79906

February 11, 2011

Balch & Bingham, LLP
Jason B Tompkins
PO Box 306
Birmingham, AL 35201-0306

RE: Jamon T Brim vs Dell Financial Sevices LLC etal
Our File No: 10293MQR2497018

Dear Sir / Madam:

Please be advised that American Express Travel Related Services, Company, Inc. / American Express Centurion Bank is unable to comply with the above referenced subpoena request for the following reason(s):

• American Express Travel Related Services Company, Inc. does not have records responsive to the subpoena request
• The name/address and Social Security number provided were not located in our database

If we can be of further assistance please do not hesitate to contact us.

Sincerely,

Jackie P Vazquez, Subpoena Correspondent
Assistant to the Custodian of Records
1-888-257-7775 ext. 66619
INSFLTR